(60 South. 195.)

No. 19,098.

LANGLINAIS v. ROSE HILL SUGAR RE- FINING CO.

(Nov. 18, 1912.    Rehearing Denied Dec. 16, 1912.)

*(Syllabus by the Court.)*

1. EVIDENCE (§ 588*)—WEIGHT OF EVIDENCE.
    The testimony of two witnesses of the plaintiff, corroborated by circumstances, will not be disregarded because of its conflict with the testimony of a witness of plaintiff, whose answers show that he was nonobservant.
    [Ed. Note.—For other cases, see Evidence, Cent. Dig. § 2437; Dec. Dig. § 588.*]

2. MASTER AND SERVANT (§ 136*)—INJURIES TO SERVANT—NEGLIGENCE.
    If a workman's head protruded above the top of a car on which he was working so that he could see an approaching locomotive, then his head could have been seen by the crew of the approaching locomotive, or he should have been seen, and the proper warning should have been given.
    [Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 272; Dec. Dig. § 136.*]

3. MASTER AND SERVANT (§ 137*)—INJURIES TO SERVANT—SAFE PLACE TO WORK.
    A railroad company must provide its employés with a reasonably safe place in which to work, and it violates this duty if without proper warning it runs a locomotive, or cars, violently against the car on which an employé is working, causing him, because of such unlooked for violence, to be knocked down and injured.
    [Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 269, 270, 273, 274, 277, 278; Dec. Dig. § 137.*]

4. MASTER AND SERVANT (§ 278*)—INJURIES TO SERVANT—WARNING—EVIDENCE.
    The proof that plaintiff had been warned during the night of the accident but subsequent to it, and answered that he did not fear the shock to his car from an approaching locomotive, does not prove that he received proper warning during the day, nor does it tend to disprove the fact that he did not receive the proper warning.
    [Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 954–972, 977; Dec. Dig. § 278.*]

Appeal from Seventeenth Judicial District Court, Parish of Vermillion; Wm. P. Edwards, Judge.

Action by Romuald Langlinais against the Rose Hill Sugar Refining Company. Judgment for plaintiff, and defendant appeals. Affirmed.

Solomon Wolff, of New Orleans, and Gordy & Gordy, of Abbeville, for appellant. Taylor & Gremillion, of Crawley, and Ralph J. Labauve, of Abbeville, for appellee.

BREAUX, C. J.    Plaintiff, a carpenter, while at work on the 10th day of October, 1910, in the afternoon, between 3 and 4 o'clock, met with an accident.

Defendant was his employer. It owns a large sugar refinery on the Vermillion river in the parish of the same name. It employs a number of workmen and has large machinery, implements, locomotive engines, railroad tracks, and other car appliances. It runs its cars over its yards adjacent to the refinery onto the main tracks. Plaintiff was at work in racking and bracing flat cars used by defendant in hauling cane from the fields to the cane crusher or juice extractors.

Cribs are constructed on the flat cars in which the cane is loaded, and, in order to make these cribs safe, iron rods are run through from one side to the other at the top of the crib, holding it steady. Holes are bored at the top of the rack crates or cribs for the purpose of running the iron rod at equal distance extending from one side to the other of the car, and these rods are made fast by screws at the end. The cars are about 10 feet high, and a small ladder was used to enable the workmen to ascend sufficiently on the side of the car to enable them to do the work of boring the holes and securing the iron rods.

Plaintiff at the particular place and at the moment he was struck was alone. His account is that he placed the ladder against the car, and that while at work, standing on

the ladder, boring the hole, the engine of defendant and one or more cars were moved in the direction of the car on which he was at work and violently struck it, knocked it from its position about 12 feet, threw him from the ladder a distance of about 8 feet, breaking, bruising, and tearing the bone and flesh of his right hip and leg; that in consequence he is maimed and has suffered excruciating pains.

Defendant, on the other hand, urged strong grounds of defense and denied all the facts upon which plaintiff rested his case. The contention of the defense is that plaintiff is contradicted in every particular; that his helper, Stelly, was not in the car at the moment of the alleged accident, as plaintiff had sworn that he was.

In the second place, that plaintiff was not on the side of the track he said he was, and that plaintiff did not properly state the height of his head from the ground. The point of the defense is that plaintiff, by the false testimony, sought to gain an undue advantage.

The defense also urged that plaintiff was injured through his own negligence and that of a fellow servant. In argument, plaintiff's physical condition was mentioned as a cause, and that defense will be considered later.

Plaintiff's wages were $2.50 per day.

Defendant seems to attach great importance to the fact that plaintiff swore that his helper, Stelly, was present at the moment he (plaintiff) fell. The helper's place was with plaintiff while at work. He handed him pieces of wood or of iron as they were needed. It happened that just at that time the helper had stepped away for a few moments, in search of a piece of iron at the blacksmith's shop. He returned a moment after the plaintiff fell, saw him on the ground, and testified that he had fallen from the side of the car, that he was with him a few moments before the fall, and that he

was boring a hole with the bracing bit or auger near the top of the car. Stelly swore that when he returned from the blacksmith's shop plaintiff was lying on the ground and the car on which he was working had been moved away about 12 feet. The ladder which plaintiff used was broken. There were five or six cars on the track on which plaintiff was working.

Stelly also swore that after he returned from the blacksmith's shop the locomotive was moving away from the cars; that is, as we understand, the locomotive which had violently pushed this car some 10 or 12 feet.

There is no evidence before us that plaintiff knew of the absence of his helper at the moment, and his statement that the helper was actually present or in the car near by does not have the appearance of seeking an improper advantage by stating an untruth. Workmen are not always careful in noting what is going on about them, and they are entitled to the benefit of a doubt.

We pass to the next proposition relating to the track on which plaintiff was working. Plaintiff testified that he was working on this track on the side of the curving center. The witness Stelly puts him on the convex side near the tank, as indicated on the diagram annexed. The purpose of plaintiff, as defendant represents, was to gain an advantage, in this, that on the convex side of the curve there were at least five cars between plaintiff and the end from which the locomotive came, and that plaintiff, for that reason, could not see the locomotive coming; at any rate, not as easily as he could from the inner side of the curve. Hence his anxiety, according to defendants, to have it concluded that he was on the outer side of the curve. Therefore the insincerity laid at the door of the witness.

Again, in this connection, plaintiff swore that his head was below the top of the car. There is contradiction, in this, that the helper, Stelly, testified that the plaintiff's head

was above the top of the car; he was holding the brace bit against his breast, boring the hole on the side about six inches from the top—a physical impossibility. It followed from this, said defendant, that plaintiff's head and vision were well above the car, and he could see the approaching locomotive. From this, defendant deduces that plaintiff could, from the position selected by him, easily see the locomotive come in. If his head was below the top of the car, especially if plaintiff stood, as he swore, on the concave tracking near the sugar house, it would be different. This line of vision was obstructed. Defendant's contention is, in substance, that plaintiff deviated from the truth as relates to the place at which he was standing, in order to carry his point and gain his cause.

[1] We are not of opinion that we should accept the theory of defendant on this point, especially as plaintiff is corroborated, both in regard to his position while using the bracing bit and in regard to the place at which

he was standing on the side of the curving track on which he was at work. Relative to the side of the car at which he was standing, plaintiff is corroborated by one of his witnesses, Primeaux. The other witness, Stelly, does not corroborate him.

We judge from the answers of this last-named witness that he is not a very observant man. He testified as if in a state of uncertainty, and was not very positive about anything, while Primeaux positively stated that plaintiff was on the inner curving side of the track and standing at work as above stated. The testimony of a nonobservant witness does not disprove the testimony of two witnesses and corroborating facts.

[2] In regard to the height of plaintiff's head from the top of the car, we have noted that he was on the side of the car, and his account seems to be entirely reasonable. Why should he have stood with his head far above the top of the car, when all concede that he was boring a hole in the side of the car six inches from the top? Conced-

**VERMILLION RIVER**

FACTORY

SKETCH
SHOWING TRACKS & BUILDINGS
OF THE ROSE HILL SUGAR REFINING CO'S
YARD AND PREMISES
JULY 18, 1911

ing for a moment that it was just as stated by defendant, that plaintiff's head towered above the car, the question suggests itself: Wasn't it as much the duty of the employés of defendant in charge of the locomotive to see the head of the man above the car at work as it was for the plaintiff to see the locomotive and get out of the way? They were approaching and should have given notice to him to step down from the ladder.

Another point very much at issue was the direction from which the engine was coming. Plaintiff had it that it was coming from the main line, while the defendant has it that it was coming from another direction. These cars, including the colliding locomotive engine, were moved about on the yard. The engine was hauling cars out of the yard and hauling others into the yard. The weight of the testimony is that the engine which collided with the car came in from the main line on track No. 2, on which plaintiff was working. The violent blow came from the right side, struck the car on which plaintiff was at work, pushing it about 13 feet, and caused plaintiff's fall and consequent injury.

Plaintiff unquestionably was knocked down. It appears by the evidence that at the time he had a monkey wrench in his right hip pocket on which he fell.

[3] We think it sufficient to state that the employer owes a safe place to his workmen, and certainly should not run its cars against him without due and timely notice.

Defendant, we have seen, sets up the physical condition of plaintiff as another ground of defense.

If his condition in this respect was as grave as represented by defendant, he surely was in a sad plight. It is stated, in substance, by the defense, that he had three separate and independent diseases: One, fits; another, a venereal disease; and, lastly, tuberculosis of the femur. It was stated in the testimony that his hip bone was par-tially destroyed by tuberculosis. As to fits, the testimony is unsatisfactory. It is not stated whether they were epileptic or apoplectic or of any other kind or nature.

It is true that some time before the accident he had an attack of some kind. The testimony is not clear as to its nature. If it was a fit, it was not dangerous; only one attack. Fits are generally recurrent. In this instance nothing more was heard of fits after this one asserted attack.

The theory of defendant on this point was that while in a fit plaintiff fell and hurt himself, and in that way defendant seeks to account for the accident.

As to the venereal disease, the testimony is not very convincing. If he had the disease, it does not appear to have prevented him from working. There were several facts sworn to that tend to prove that there is nothing serious in this charge.

As relates to the tuberculosis which partly destroyed the femur, the facts are that, after plaintiff became a patient of the Charity Hospital, the physician in charge testified that he was suffering from a severe contusion which did not subside. He, for that reason, ordered an X-ray to be taken. From the print taken, it appears that the femur bone was very much involved, to such an extent that it was impossible, the physicians stated, for the tuberculosis to have been caused by the fall and to have developed as it did from the date of the accident to the day of the X-ray examination at the hospital; that it was entirely unusual for a blow of any kind to produce consumption or tuberculosis.

The following was propounded:

"Can you tell whether the blow which might have caused that contusion could have produced the tuberculosis which partly destroyed the hip bone?

"A. Decidedly, no, sir. I speak of the bone for which I treated him. That is the contusion which was at the upper part of the thigh on the hip."

This singular phase of the case growing out of the tuberculosis of the femur leads to no satisfactory conclusion. The blow and fall were not the according cause of the tuberculosis of the femur. The plaintiff had not, prior to the accident, felt the disease, which was only discovered with the assistance of the X-ray. The blow was severe. We have noted that it threw the plaintiff down. There were contusions and bruises, but naught to do with the tuberculosis mentioned except possibly to aggravate it. It caused the disease to develop and to become a severe case. Although the blow was not the cause of the whole injury, it was sufficient to give to plaintiff a right to damages.

The testimony of physicians was that there was suffering felt from the blow prior to the discovery, as before stated.

The condition to which plaintiff was reduced began with the very severe blow. In addition to the contusions, other severe injury was suffered, rendering necessary the application of a plaster cast.

We pass the question of venereal disease without comment further than to state that, if he had any such disease, it does not appear that it was aggravated by the fall.

It appears further in the history of this case that the patient was received at the Charity Hospital, as before stated, treated, and when discharged from the hospital he had a plaster cast on, placed on him according to the direction of the hospital physician. He was directed to retain it until he returned again to the hospital for its removal. The plaintiff resided at some distance in the country. He repaired to his home, and while there became indifferent to the physician's admonition not to remove the plaster cast. After consulting, as he stated, with the local physician, he removed the plaster cast, using his saw to effect the removal. This imprudent and improper act fortunately for him had no bad effect.

131 LA.—23

The incidents heretofore mentioned may be of a mitigating character, but they are not sufficient to deny all damages. The young man was 19 years of age, able bodied, and performed his daily tasks. While the diseases which quickly became known after the accident were not occasioned by the accident, still defendant cannot be considered as entirely free from all responsibility.

We will dwell for a moment, before closing, on the testimony of the witnesses for defendant. Some of them were engaged in the same kind of work as plaintiff at the refinery, and others were in charge of the switching locomotive and trains. Part of the testimony would lead to a different conclusion if it were entirely consistent and direct. These witnesses testified generally that there was a blowing of whistles and the ringing of bells. They mention that on a certain occasion the brakeman and conductor were particularly concerned about the safety of the men at work on the yard. These witnesses would entirely change the hour of the accident.

Plaintiff, young and active, soon recovered from his fall and did not at the moment feel the extent of his injury. He resumed work in the afternoon and continued to work until way in the night. The workmen, if they chose, could continue to work until 12 o'clock at night; that is, work overtime, for which they received extra pay. It was for this extra pay that plaintiff continued to work, although he had fallen as before mentioned. That night and the next day he found it impossible to continue.

[4] Now, all of the ringing of bells of the locomotives and the blowing of whistles and the attention given to the men in the yards, as testified to by defendant's witnesses, may have been given during the extra watch of the night; but they do not appear to have been given in the afternoon at the time that plaintiff met with his fall. It was stated

that at night the plaintiff was specially warned of an approaching locomotive, and his answer was that he did not fear. It may be that at that moment he was indifferent as indicated by his answer, although he had been wounded as above stated. There are men who are rendered timid by the least accident and fear the least occurrence, while others are indifferent and continue to work without much regard of further danger.

We can only state, as relates to the amount of damages which are to be allowed, that plaintiff's pain and sufferings were intense for a number of weeks. He was confined to his bed. One of his legs since is three-fourths of an inch shorter than the other.

It is therefore ordered, adjudged, and decreed that plaintiff do have judgment against the defendant, affirming the judgment of the district court, at appellant's costs.